## HENDERSON CO. v. THOMPSON et al.

### PORTLAND GASOLINE CO. v. SAME.

#### Nos. 535, 581.

District Court, W. D. Texas, Austin Division.

March 30, 1936.

L. M. Fischer, of Amarillo, Tex., and F. W. Fischer, of Tyler, Tex., for Henderson Co.

Alto Cervin and Allen & Allen, all of Dallas, Tex., and Black & Graves, of Austin, Tex., for Portland Gasoline Co.

Wm. McCraw, Atty. Gen., of Texas, and Wm. Madden Hill, Asst. Atty. Gen. (C. C. Small, of Amarillo, Tex.; of counsel), for respondents.

Before HUTCHESON, Circuit Judge, and KENNERLY and McMILLAN, District Judges.

McMILLAN, District Judge.

These two cases are now before the court for final hearing on the merits. While there are slight variations in the facts with regard to the two complainants, the general principles underlying the cases are the same, and the two cases while not consolidated were tried together and may be disposed of in the one opinion.

The Henderson case has been before this court before on application for preliminary injunction. Henderson Company v. E. O. Thompson et al., 12 F.Supp. 519. The Portland case has not heretofore been before the court on application for preliminary injunction, but the complainant, while continuing to press for temporary relief, has agreed, in open court, with respondents that the case will be considered as also finally submitted on its merits. The Henderson Company is a Maine corporation and the Portland Company is a Delaware corporation and the court has jurisdiction in both cases, both because of diversity of citizenship and federal question coupled with the requisite amount in controversy. Jurisdiction in equity is also apparent on the face of the records.

Complainants assail House Bill 266, chapter 120, passed by the 44th Legislature, Regular Session, 1935 (Vernon's Ann.Civ. St. art. 6008), and certain orders of the Railroad Commission purporting to have been made by virtue thereof. Their grievance against the statute lies in the restrictions which it places upon the use of sweet gas. Their attack against the orders of the commission is incidental inasmuch as those

330

orders simply purport to carry out the mandate of the statute and classify certain of complainants' wells as sweet and sour. While the bills of complaint also attack the orders of the commission with regard to the proration features thereof, that phase of the matter has been expressly abandoned by the Henderson Company in so far as this case is concerned by statements made in its briefs, and impliedly by the Portland Company by its failure to press that contention, either in its evidence or its briefs.

Accordingly, the matter at issue narrows down to whether the action of the Legislature in restricting the uses to which sweet gas may be put and in defining what constitutes sweet gas is unconstitutional as applied to complainants. The statute in so far as it is called in question here will, for convenience, be footnoted in this opinion.[1]

Complainants either by contract or ownership have been taking gas from a great number of wells in the Panhandle field in Texas, and after stripping same for its gasoline content and using a part of the remainder for plant and lease purposes, delivering the residue by virtue of contract to certain carbon black plants, where that gas is burned for the purpose of making carbon black without further use being made thereof. After the passage of the statute attacked, the Railroad Commission conducted a series of tests and classified complainants' wells as sweet or sour. A great majority of the Henderson Company's wells have been classified as sweet and the allowable from its sour wells is insufficient to cover its requirements. Thirteen of the Portland Company's wells produce casinghead gas which may be used for car-

---

1 (Acts 44 Leg. 1935, c. 120, Vernon's Ann.Civ.Stat. art. 6008.)

"Section 1. Declaration of policy: In recognition of past, present, and imminent evils occurring in the production and use of natural gas, as a result of waste in the production and use thereof in the absence of correlative opportunities of owners of gas in a common reservoir to produce and use the same, this law is enacted for the protection of public and private interests against such evils by prohibiting waste and compelling ratable production."

Article 6008 (of the R. C. S. of Texas of 1925 as amended, etc.) is hereby amended so as to hereafter read as follows:

"Sec. 2. Unless the context otherwise requires, the words defined in this Section shall have the following meaning when used in this Article to wit: * * *

"(g) The term 'sour gas' shall mean any natural gas containing more than one and one-half (1½) grains of hydrogen sulphide per one hundred (100) cubic feet or more than thirty (30) grains of total sulphur per one hundred (100) cubic feet, or gas which in its natural state is found by the Commission to be unfit for use in generating light or fuel for domestic purposes.

"(h) The term 'sweet gas' shall mean all natural gas except 'sour gas' and 'casinghead gas.'

"(i) The term 'casinghead gas' shall mean any gas and/or vapor indigenous to an oil stratum and produced from such stratum with oil.

"(j) The term 'natural gasoline' shall apply to gasoline manufactured from casinghead gas or from any natural gas. * *

"Sec. 3. The production, transportation, or use of natural gas in such manner, in such amount, or under such condi-

tions as to constitute waste is hereby declared to be unlawful and is prohibited. The term 'waste' among other things shall specifically include: * * *

"(j) The use of sweet gas produced from a gas well for the manufacture of carbon black. * * *

"Sec. 7. After the expiration of ten (10) days from the time of encountering gas in a gas well, no gas from such well shall be permitted to escape into the air, and all gas produced therefrom shall be utilized for the following purposes:

"(1) No sweet gas shall be utilized except for:

"(a) Light or fuel.

"(b) Efficient chemical manufacturing, other than the manufacture of carbon black.

"(c) Bona fide introduction of gas into oil, or gas bearing horizon, in order to maintain or increase the rock pressure or otherwise increase the ultimate recovery of oil or gas from such horizon.

"(d) The extraction of natural gasoline therefrom when the residue is returned to the horizon from which it is produced.

"(2) In addition to the purposes for which sweet gas produced from a gas well may be used, sour gas may be used for efficient chemical manufacturing purposes including the manufacture of carbon black provided it is utilized in a plant producing a recovery of not less than one (1) pound of carbon black to each one thousand (1000) cubic feet of gas, and provided further that the gasoline content is removed and saved from such sour gas before the same is utilized for carbon black.

"(3) Casinghead gas may be used for any beneficial purpose, which includes the manufacture of natural gasoline."

bon black manufacture, but the production from those wells, coupled with its allowable from its sour gas wells, is insufficient to meet its requirements. The rub with regard to both complainants lies in the inhibition in the statute against the use of sweet gas for the manufacture of carbon black. If complainants were allowed to use the gas from their sweet wells to fulfill their contracts with the carbon black companies, they would be without complaint so far as the present case is concerned. Accordingly, as indicated, the matter finally narrows down to the question whether the Legislature was within the law in defining what constitutes sweet and sour gas and forbidding the use of the sweet gas for the making of carbon black.

Complainants attack the statute on substantially three grounds, one of which divides itself into two propositions. First, they assert that the statute bears no reasonable relationship to the prevention of waste and accordingly is not a conservation of the natural resources of the state and constitutes an unreasonable interference with and confiscation of their property. Second, they assert that the statute unlawfully discriminates between the owners of sweet and sour gas, and as a further proposition in this connection, they say that the definition of sour gas contained in subdivision (g) of section 2 (Vernon's Ann. Civ.St.Tex. art. 6008, § 2 (g) is without basis or foundation in fact and accordingly void. Third, they assert that the operation of the statute impairs the obligation of their contracts with the carbon black companies in violation of the Constitution of the state of Texas (article 1, § 16).

The case has been thoroughly developed by ex parte affidavits introduced by agreement of the parties, by oral testimony, and by numerous maps, exhibits, and much documentary evidence. It has been thoroughly argued and fully and carefully briefed by both sides. The evidence has taken a wide range and it is impracticable to do more than summarize it and refer to it briefly in the course of this opinion.

The carbon black industry has been nomadic, journeying from field to field ever in quest of cheap gas. For over sixty years it has existed in this country moving generally westward, first in Pennsylvania, then in West Virginia, then Louisiana, then Kentucky, and latterly coming into Texas, Oklahoma, Utah, Montana, and Wyoming. As the various states tightened their regulations by statutes and orders, the industry moved on until now it is largely centered in the Panhandle field of Texas and from that giant reservoir approximately 80 per cent. of the carbon black manufactured today is being derived.

There have been few improvements made in the method of manufacturing since 1892, the one commonly employed, and employed by complainants, being the channel process. It is unnecessary to describe this process here as it is fully described by the Supreme Court in Walls v. Midland Carbon Co., 254 U.S. 300, 41 S.Ct. 118, 122, 65 L. Ed. 276. Either sweet or sour or casinghead gas may be used in its production, and from the burning of 1,000 cubic feet of gas approximately one and one-half pounds of carbon black is made. The gas is entirely used in the manufacture of carbon black and there is no residue that can be devoted to any other useful purpose.

Carbon black is worth about 4 cents a pound. From the gas before its ultimate burning, there is stripped a fraction of a gallon of gasoline, which is worth from 2 to 3 cents. A producer of sweet gas who is able to market same for statutory purposes receives about 3 or 4 cents a thousand in the field. When delivered at the burner tips, it sells for various greatly increased amounts. The producers of gas who sell to the companies that strip it and then burn it for carbon black receive less than a cent per thousand cubic feet.

Sweet gas is available without treatment for fuel and light, but sour gas cannot be so used without being scrubbed or processed, as the hydrogen sulphide content makes it corrosive, thereby injuring the pipe lines, equipment, burners, and other mechanical appliances through which it has to pass. In addition thereto, its odor and detrimental effect on the health of persons adjacent to it when burning renders it undesirable to use for fuel or light.

There is evidence in the record to indicate that probably as much as 30 pounds of carbon can be recovered from 1,000 cubic feet of gas by other processes than those used by complainants. The evidence would also indicate that this carbon so recovered is not what is commonly known as carbon black inasmuch as it is coarser in its texture and not available for many of the uses to which carbon black is put. There is some indication that restriction upon the use of gas may cause advancement in the industry which will recover a greater yield

of carbon black, but up to the present time there is no indication that any better methods have been developed than the channel process.

Carbon black has a wide range in its usefulness, it being used in the manufacture of printer's ink, automobile tires, rubber products, paint, varnish, typewriter ribbons, colored paper, lacquers, stove polish, shoe polish, book binders' board, crayons, golf balls, tarpaulins, insulating material, phonograph records, cement, tile, and artificial stone. So far as is known, it can only be manufactured from natural gas.

There are twenty-nine carbon black plants operating in the Panhandle field with an average consumption of approximately 550,000,000 cubic feet per day. This amount is only slightly less than the average daily amount taken by all the pipe lines for fuel and light purposes. When the carbon black industry first came into the Panhandle field, it practically used only casinghead gas, but afterwards by virtue of amended statutes and orders it commenced to use, in addition thereto, both sweet and sour gas. The Panhandle field is the largest gas field known in the world today. It has a length of about 125 miles and varies in width from 10 to 40 miles. While the field is apparently a common reservoir, there is a line of demarkation which fairly separates the sour gas area from the sweet gas area. Along the sour gas area are oil fields and in the past great waste of gas has taken place adjacent to those fields. Accordingly, as a general thing, the pressures in the sour gas area are lower than those in the sweet gas area. Lowering the pressure tends to cause migration from higher pressure areas to lower pressure areas, but the length of time which it takes to accomplish this is not definitely known. Expert opinion, based upon substantial facts, sustains the view that there is enough sour gas in reserve in the Panhandle field to fulfill the world's requirements of carbon black for many years to come.

The statement of facts with regard to this vast field and the carbon black industry might, on the record as it now stands, be protracted indefinitely. We consider it unnecessary to go into the matter any further for the purposes of this decision. The matters have been covered generally by this court in many other cases involving this same field.

In line with complainants' contentions, it is first necessary to consider whether the statute has any reasonable relationship to the conservation of the natural resources of the state and the prevention of waste. We held on the application for preliminary injunction in the Henderson case that the mere legislative declaration of waste was not conclusive if facts could be adduced which clearly indicated the contrary. The Constitution of the state of Texas delegates to the Legislature the power to conserve the natural resources of the state, and that gas constitutes one of those natural resources is now too well settled to admit of further controversy.

Regulations looking to the conservation of gas and the prevention of its waste may be validly made, and if they have a reasonable relationship to those things, it is immaterial that they interfere with the uses which the individual may desire to make of his property. A Texas landowner owns the gas in place under his land and he may withdraw the same by mining operations, and if in the course of so doing part of his neighbor's gas migrates to his land, he may withdraw that gas without liability. The statement of these facts, coupled with the known migratory character of gas, immediately makes it apparent that there must be some limitations upon these property rights which exist in the landowner. While he has the unquestioned right to withdraw his gas, and such gas as may migrate to his land, it is perfectly evident that if he does so in a wasteful manner or for a wasteful purpose he has exceeded any property right which he may have been thought to have had. The migratory nature of gas distinguishes it from other minerals which are fixed. An owner of a coal mine or of a sulphur mine might withdraw his minerals and destroy them without injury to his neighbor, other than such injury as he sustains in common with the general public in that economic loss, but the owner of a gas well, who under the capture doctrine, withdraws gas which has theretofore been his neighbor's and uses it wastefully, thereby not only destroys a natural resource of the state, but impinges upon the rights of others in the common reservoir.

These principles so far as matters pertaining to underground waste per se, such as operations which cause channeling, coning, entrapment, etc., are concerned, are now undisputed. There is no good reason why they should not equally apply to forbid the withdrawal of gas from a common

reservoir to be wastefully used above the ground. The effect of the statute is in fact to regulate the gas in the reservoir by preventing its withdrawal for use in a wasteful manner.

It is thoroughly settled that the popping off of gas into the air is a wasteful practice which may be forbidden; that the production of an oil well with an inefficient gas oil ratio may be stopped; that gas wells may under certain circumstances be ordered plugged, and the stripping of gas for the purpose of securing its gasoline content may be prohibited. See Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160; Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; Bandini Petroleum Co. v. Superior Court, Los Angeles County, California, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826, and F. C. Henderson, Inc., v. Railroad Commission (D.C.) 56 F.(2d) 218.

If this be true, how can it be successfully argued that it lies beyond the power of the state to forbid the burning of sweet gas to manufacture carbon black? It is unquestionably true that carbon black is a useful product necessary to the commerce of the world, but the same can be said of gasoline. If the stripping of gas to obtain gasoline is held to be wasteful, as was done in the Henderson Case, because of the disproportion between the large amount of gas used and the small amount of gasoline recovered, is there any legitimate reason why the same rule should not be applied to the manufacture of carbon black? Is the Legislature not entitled to consider and determine whether the results obtained by destroying this natural resource are commensurate with the injury that is done?

■ The question of the value of the product obtained as compared to the value of the raw gas is not at all determinative of the matter. We are not convinced that complainants' method of approach, that is to say, the value of a pound of carbon black plus the gasoline stripped as compared to the sale price in the field of a thousand cubic feet of gas is correct. Many contingencies enter into the value of these two commodities which are not covered by the simple statement of their market price in the field. However, regardless of that question, the matters of value are not controlling. The question of the utility of carbon black as against the utility of sweet gas for light and fuel does not finally determine the issue. As said by the Supreme Court in the Walls Case in passing on that contention:

"The fact, however, is but of incidental importance. The determining consideration is the power of the state over, and its regulation of, a property in which others besides the companies may have rights, and in which the state has an interest to adjust and preserve; natural gas being one of the resources of the state. And in this consideration it is more important to consider, not for what a particular owner uses the gas, but the proportion of his use to that of others, or, it may be, the prevention of use by others."

■ The state in the conservation of its natural resources is not without power to consider the uses to which those resources are most appropriately adapted and to conserve certain resources for public uses, although the result thereof may be to destroy another use.

"When forced to such a choice the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another which, in the judgment of the legislature, is of greater value to the public." Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 247, 72 L.Ed. 568.

■ If upon the facts of the case the Legislature has decided that the burning of sweet gas to make carbon black constitutes too great a destruction of a natural resource of the state for the result accomplished, and that, on the other hand, it is more desirable for that gas to be devoted to other necessary uses, it does not lie within the power of the court to review that determination and substitute its judgment, conscience, and discretion for the judgment, conscience, and discretion of the legislative body. Unless the determination of the Legislature is clearly without factual support thereby rendering it arbitrary and unreasonable, the court is without power to intervene.

■ Having these general principles in mind and carrying in mind also the facts as we have heretofore stated them, we are unable to say that the statute attacked does not bear a reasonable relationship to the conservation of the natural resources of the state. The views which we have expressed are directly sustained by the decision of the Supreme Court in Walls v. Midland Carbon Co., supra, and general-

334

ly by such decisions as Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729, Bandini Petroleum Co. v. Superior Court, Los Angeles County, California, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A. L.R. 826, and F. C. Henderson, Inc., v. Railroad Commission (D.C.) 56 F.(2d) 218.

Complainants attempt to differentiate the Walls Case because of the difference in the title to gas in place as between Texas and Wyoming. With regard to the matters at issue here, the distinction is without importance. Oxford Oil Co. v. Atlantic Oil & Producing Co. (D.C.) 16 F.(2d) 639; Id. (C.C.A.) 22 F.(2d) 597.

We come accordingly then to complainants' second contention that the statute is void because of discrimination as between the sweet and sour gas owners and because there is no basis in fact for the definition of sour gas. There can be no question of the right of the Legislature to classify if the classification operates equally upon all parties within the class and is based upon some valid grounds of distinction. Lindsley v. Natural Carbonic Gas Co., supra; Middleton v. Texas Power & Light Co., 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527.

That the statute operates equally upon all parties within the classification cannot be gainsaid. That the classification is not arbitrary because resting upon a reasonable basis, we think to be equally apparent. It is unnecessary to rehearse the facts. Briefly it may be stated that sweet gas is available without treatment for light and fuel uses; sour gas is not. While carbon black may be made from sweet gas, it can also be made with practically equal facility from sour gas. As a matter of marshaling the natural resources of the state, the Legislature has the power when one resource is fitted for two uses and another resource for only one, to classify those natural resources as to the use to be made of them. That is to say, that proceeding on the premise that the regulation generally is one tending to the conservation of the natural resources of the state there is no reason why those resources should not be classified if a valid difference exists between them.

The state at this time does not completely outlaw the carbon black industry, but, on the contrary, devotes to it an enormous supply of its gas reserves. The distinction made between sweet and sour gas having its basis upon a solid foundation of fact, complainants are in no position to complain because sour gas may be used for carbon black while sweet gas may not.

Complainants' contention that the legislative definition of sour gas is unsupported by the facts is untenable. While the evidence indicates that gas containing approximately one and one-half grains of hydrogen sulphide per hundred cubic feet may be very easily and economically processed, the fact still remains that it has to be treated before it is available for use for light and fuel to the same extent, and as satisfactorily, as gases of lower sulphide content. The court is unable to say the legislative definition is arbitrary or unreasonable.

As heretofore noted, complainants' third ground of attack rests upon the claimed impairment of their contracts with the carbon black companies in violation of section 16, article 1, of the State Constitution. Here they base their reliance upon Travelers' Insurance Co. v. Marshall, 124 Tex. 45, 76 S.W.(2d) 1007, 96 A.L.R. 802, a decision by the Supreme Court of Texas. The decision does not support their position in so far as the facts of these cases are concerned. There the effect of the act, which was a moratorium statute, was to operate directly upon certain contractual obligations. Here the act touches the contracts only incidentally and by virtue of an exercise of the inherent police power existing in the state. While the power of directly impairing contractual obligations may have been withdrawn from the general power of the government by the Texas Constitution, that instrument has never been held to avoid a police statute dealing directly with physical things in the interest of the public welfare, and touching contractual relationships only incidentally as they may have attached to those physical things prior to the passage of the statute.

Where matters affect the public safety, health, welfare, morals, or well being, they may not by contract be placed beyond the power of the state to regulate and control them. The argument defeats itself. If it were conceded to be true, any individual could by contract place his business or property beyond the realm of the police power. The protection relied on by complainants is given only against direct impairment and not that indirect abrogation, which flows incidentally from the valid exercise of the police power.

The parts of the statute and the orders under attack here are authorized by the Constitution of the state of Texas and in no way contravene the Constitution of the United States. Unlike the proration order concerning which we have written in an opinion handed down today in Consolidated Gas Utilities Corporation et al. v. Thompson et al., 14 F.Supp. 318, the statute and order in question in so far as they define and classify sweet, sour, and casinghead gas and regulate the use thereof are true waste measures, bearing a reasonable relationship to the conservation of the natural resources of the state. As such, they must be sustained.

The injunctions will be denied.