**RAILROAD COMMISSION OF TEXAS et al. v. FLOUR BLUFF OIL COR-PORATION et al.**

No. 9795.

Court of Civil Appeals of Texas. Austin.
March 23, 1949.

Rehearing denied April 13, 1949.

Price Daniel, Atty. Gen., of Texas, and Fagan Dickson, Joe Greenhill and Elton M. Hyder, Jr., Asst. Attys. Gen., for appellants.

W. B. Browder, Jr., of Houston, Ben F. Vaughan, Jr., of Corpus Christi, J. A. Rauhut, of Austin, Rex G. Baker, Nelson Jones, Vinson, Elkins, Weems & Francis, all of Houston (Powell, Wirtz & Rauhut, of Austin, of counsel), for appellees.

HUGHES, Justice.

This suit was filed by appellees, Flour Bluff Oil Corporation, Barnsdall Oil Company, and Humble Oil and Refining Company, against the Texas Railroad Commission, its members and the Attorney General of Texas, appellants, to enjoin the enforcement of an order of the Commission issued November 24, 1948, prohibiting the production of any oil or gas from any well in the Flour Bluff Oil Field located in Nueces County, from and after December 1, 1948, "unless and until all of the gas produced incident to · such production is made available for one or more of the lawful uses as set· out for sweet gas in subsection 1 of Section 7, Article 6008, Title 102 of the Civil Statutes of this state, Vernon's Ann.Civ.St. art. 6008, § 7(1) (a–d), which said lawful uses, as therein set out, are as follows:

"(a) Light or fuel.

"(b) Efficient chemical manufacturing, other than the manufacture of carbon black * * *.

"(c) Bona fide introduction of gas into oil, or gas bearing horizon, in order to maintain or increase the rock pressure or otherwise increase the ultimate recovery of oil or gas from such horizon.

"(d) The extraction of natural gasoline therefrom when the residue is returned to the horizon from which it is produced."

This appeal is from a judgment awarding appellees a permanent injunction against the enforcement of such order.

It is undisputed that appellees are flaring (wasting) enormous quantities of sweet gas which is produced along with the oil from oil wells as well as gas from wells which is injected into oil wells for the purpose of aiding in lifting the oil therefrom. This gas is flared as residue gas after being processed through a gasoline plant located in the field.

■ Under the recent decisions of the Supreme Court in Railroad Commission v. Shell Co., Inc., 146 Tex. 286, 206 S.W.2d 235 (Seeligson case), and Railroad Commission v. Sterling Oil and Refining Co., Tex.Sup., 218 S.W.2d 415, the power and authority of the Commission to issue the order in question is fully sustained. It is only necessary that we determine whether such order as applied to the Flour Bluff Field is reasonable and whether or not it is supported by substantial evidence.

The oil industry has been aware for some time that the Commission was concerned with the waste of natural gas and that it contemplated taking steps to remedy the situation. In January 1946, the Commission issued notice to operators in certain fields, including the Flour Bluff Field, of a hearing to determine what should be done with Casinghead gas being flared from oil wells and the feasibility of returning such flared gas to the horizon from which it was produced. Each operator was requested to be prepared to submit data and recommendations as to what should be done in order to stop the waste and increase the ultimate recovery of oil. This hearing was held

On May 28, 1948, the Commission issued notice to the operators in the Flour Bluff Field to appear on June 15, 1948, and show cause why the gas produced from this field and being flared should not be conserved, and if no other means of conservation were available why the field should not be "closed in until such time as said gas can be more efficiently utilized." This hearing was held.

A similar notice of hearing was issued to the operators in the Flour Bluff Field on October 15, 1948, and hearing pursuant thereto was held October 26, 1948.

■ We find without merit appellees' contention that the order in suit is unreasonable because of the lapse of only six days between date of issuance and effective date. It was never necessary for anyone to inform appellees of the obvious fact that natural sweet gas was a valuable and expendable natural resource, and that by flaring it they were wasting it. The above evidence as to hearings shows that the shut down order did not take, or at least should not have taken, appellees by surprise. They have always known that by flaring gas they were wasting it, and they have known for almost three years that the Commission intended to do something about it. A similar order issued about the same date and effective on the same date was held reasonable in the Sterling case, supra.

It is also appellees' contention that the only practical use to be made of the residue gas now being flared is its sale for light and fuel. Utilization of the gas for this purpose is dependent upon the installation of compressors at considerable expense. These are required to give the gas sufficient pressure to enter the gas pipe line. There are three of such pipe lines in the vicinity of this field, two about 35 miles distant and one, owned by the Houston Natural Gas Company, runs through the Flour Bluff Field. After negotiations which commenced about one year prior to the trial of this case, a contract has been made with the Houston concern to take all of the residue gas now being flared in this field. Compressors are being installed and the evidence is that they will be complete by May 1, 1949, after which there will be no flaring of gas.

It would seem, then, that appellees made no effort to dispose of this residue gas to

the Houston Natural Gas Company, which had a line in the field, for almost two years after it knew that the Commission was concerning itself about the waste of this gas. Nor does the record show that appellees ever made an effort to sell this gas to either of the other two pipe lines located some 35 miles away, although such distance would naturally constitute an economic deterrent. It is apparently in the sense of financial gain that appellees use the word "practical" when they contend that the only "practical use" which can now be made of residue gas from this field is its sale for fuel and light.

This view is further reflected by the evidence bearing upon another use of this gas which the Commission authorized—injection back into the reservoir from which it came.

Mr. R. C. Granberry, Jr., a petroleum engineer employed by appellee Humble, testified:

"Q. Mr. Granberry, is it true that at all times since the Humble Company's reservoir engineers have been studying this field it has been the opinion of you and other engineers engaged in this work that the return of this residue gas to the reservoir would not aid substantially in the recovery of oil from the reservoir?

"A. Yes, sir. We have studied that reservoir several times during the past years, and we have always felt that any additional oil that might be recovered by returning this gas to the reservoir, that such a large investment would be required, that it wasn't economically sound to enter into such an operation.

"Q. Then from the standpoint of an engineer interested in these reservoir studies, would you say that the only practical use which could be made at any time of this residue gas would be to sell the gas for one of the purposes designated by the Commission?

"A. On the data that we now have available and up to this last pressure survey and the last study that we made, I don't feel that I could recommend that this gas be returned to the reservoir in the Flour Bluff Field at the present time. I don't feel it is economically justified."

It is conceded that gas can be returned to the earth. Many oil fields in Texas employ this method of preventing waste.

If the prevention of waste of natural resources such as gas is to await the time when direct and immediate profits can be realized from the operation, there would have been little need for the people of Texas to have amended their Constitution by declaring that the preservation and conservation of natural resources of the State are public rights and duties and directing that the Legislature pass such laws as may be appropriate thereto (Sec. 59a, Art. 16, Tex. Constitution, Vernon's Ann.St.), for private enterprise would not need the compulsion of law to conserve these resources if the practice were financially profitable.

█ Many of our laws, such as health and safety regulations, are upheld under police powers of the government although obedience results in financial loss. Conservation laws are similar in nature and noncompliance therewith cannot be justified on economic grounds. Henderson Co. v. Thompson, D.C., 14 F.Supp. 328, affirmed 300 U.S. 258, 57 S.Ct. 447; 81 L.Ed. 632.

The only serious question raised by the evidence, in our opinion, is whether the shut down order will cause more waste than it prevents.

Mr. Granberry testified for appellees that, in his opinion, 275,000 barrels of oil would be lost if the Flour Bluff Field were shut in from December 1, 1948, to May 1, 1949, this loss being accounted for by action of a water drive in the field which would cause the oil to be driven into a sand formerly filled only with gas, and this oil-saturated sand would not give up all of the oil under present production methods and such residue would be lost.

Opposed to this theoretical loss in the actual and known loss of gas, the amount of which is 6,100,000 cubic feet of sweet gas daily produced with the oil and 2,600,000 cubic feet of sweet gas daily produced from gas wells. This amount of gas produced and wasted daily from December 1, 1948 to May 1, 1949, would be equivalent (in B.T. U. content) to the waste of 217,000 barrels of oil.

The Railroad Commission, an expert body, has had under study the problem of preventing waste of gas since as early as January 1946. Three hearings have been conducted by it and we have no reason to doubt that the Commission gave careful consideration to the effect its order shutting down this field would have. The evidence suggests that the loss anticipated by Mr. Granberry could be minimized by the injection of gas to retard the water drive.

We do not feel that the Commission's judgment, exercised in the public interest and as to matters about which it has special knowledge, should be overturned upon the showing made by appellees.

A careful study of the entire record leads us to the conclusion that the shut down order was neither unreasonable nor arbitrary and that it is supported by substantial evidence.

It follows that the trial court erred in enjoining enforcement of this order and its judgment is therefore reversed and judgment is here rendered dissolving such injunction.

Reversed and injunction dissolved.