HOUSTON LIGHTING & POWER COMPANY, Appellant,

v.

RAILROAD COMMISSION OF TEXAS et al., Appellees.

No. B-5294.

Supreme Court of Texas.

Nov. 12, 1975.

Rehearing Denied Dec. 10, 1975.

Anderson, Brown, Orn & Jones, Nelson Jones, Houston, Brown, Maroney, Rose, Baker & Barber, Charlie D. Dye, Austin, for appellant.

John L. Hill, Atty. Gen., Rex H. White, Jr., Asst. Atty. Gen., Austin, Fulbright & Jaworski, Jefferson D. Giller, Vinson, El-kins, Searls, Connally & Smith, F. J. Coleman, Jr., and J. Evans Attwell, Jerry Fortenberry and Alan Nash, Houston, for appellees.

REAVLEY, Justice.

Houston Lighting & Power Company brought this suit to set aside and to enjoin enforcement of an order of the Railroad Commission. The order under attack sets a curtailment program for United Texas Transmission Company; that is, the order assigns priorities for the delivery of natural gas by United Texas Transmission in the event and whenever its supply of gas is insufficient to meet the requirements of all of its customers. The trial court upheld the validity of the Commission's order and denied the injunctive relief sought by Houston Lighting & Power. A direct appeal was brought to this Court pursuant to Article 1738a, Vernon's Ann.Civ.St., and Rule 499a, Tex.Rules Civ.Proc. We affirm the judgment of the trial court.

Houston Lighting & Power is a public utility which generates electricity at ten plants and serves the domestic and industrial needs for electricity of 700,000 customers in an area comprising 5600 square miles within a 60 mile radius of Houston. Its generation facilities employ turbines driven by steam produced in boilers heated by gas. A contract executed in 1964 bound United Texas Transmission Company (formerly Pennzoil Pipeline Company) to deliver 50% of the gas requirements of Houston Lighting & Power until December 31, 1984. In 1972 that contract was amended to require United Texas Transmission to deliver to Houston Lighting & Power a total of 2.8 trillion cubic feet of gas over the remaining years of the contract in certain quantities prescribed for each year. The contract provides that in the event United Texas Transmission should be unable to supply the full gas requirements of all of its consumers, Houston Lighting & Power's requirements for generation of electricity sold to domes-

tic consumers shall be satisfied before industrial demands are met.[1]

United Texas Transmission is a gas utility as defined by Article 6050, Vernon's Ann. Civ.St., and is therefore subject to regulation and control by the Railroad Commission of Texas. On January 5, 1973, the Commission entered an order in Gas Utilities Division Docket No. 489 which set a curtailment program for all intrastate gas utilities in Texas. Then on May 22, 1973, the Commission in Docket No. 502 entered the order which applied specifically to United Texas Transmission, which order is the subject of the attack in this case. The scale of priorities in that order are set forth verbatim in the footnote.[2] The effect of the Commission's order is to curtail all of the gas supply which Houston Lighting & Power receives from United Texas Transmission at an earlier point than their contract provides. Gas which Houston Lighting & Power needs to generate electricity for its domestic customers cannot be obtained until after United Texas Transmission meets industrial demands to which it has a firm contractual commitment.

The Commission's order therefore has a serious effect upon Houston Lighting & Power. The only curtailment of supply by United Texas Transmission in 1974 was for its customers using large volumes of gas for boiler fuel, the classification into which Houston Lighting & Power falls. For the months of January, February and March of 1975, Houston Lighting & Power would have suffered 58% reduction in its supply if the provisions of the contract with United Texas Transmission had been followed; but under the terms of the Commission's order, it suffered 87% reduction in that supply. In 1974 Houston Lighting & Power was forced to burn large amounts of fuel oil, costing some 3½ million dollars in excess of

1. The clause in the contract between Houston Lighting & Power and United Texas Transmission follows:

   8. IMPAIRMENT OF DELIVERIES

   Buyer specifically recognizes the fact that Seller delivers gas to gas utilities for resale to domestic consumers and to public utility power plants for generation of electricity which is sold to domestic consumers and to other industrial consumers. In the event a shortage of gas renders Seller unable to supply the full gas requirements of all its consumers, then it is mutually agreed that the gas requirements of gas utilities selling gas to domestic consumers shall first be supplied by Seller and next the gas requirements of public utility power plants (including plants of Buyer) using gas for generation of electricity which is sold to domestic consumers, shall be supplied, and if Seller does not have sufficient gas to supply all of the requirements of said power plants, then said requirements shall be supplied ratably. The remaining available gas supply shall be prorated by Seller among its other consumers. In instances, such as this, where Seller is supplying less than the full requirements of Buyer, it is the intent of this section that any priority granted hereunder shall run only to that part of the requirements of each ultimate customer as was immediately prior to such shortage being supplied by gas furnished by Seller, directly or indirectly.

2. The Commission's order in Docket No. 502 requires that if United Texas Transmission Company is unable to meet the needs of all of its customers, it is to deliver according to the following priorities:
   A. Residential, hospitals, schools, churches and other human needs customers.
   B. Small commercial (less than 100 Mcf on an average day).
   C. Large commercial (100 Mcf or more on an average day) and industrial requirements for pilot lights and plant protection.
   D. Small industrial (less than 3,000 Mcf on an average day) requirements for feedstock and process gas needs.
   E. Large industrial (3,000 Mcf or more on an average day) requirements for feedstock and process gas needs.
   F. Industrial requirements not specified in priorities C, D, E, or G.
   G. (1) Boiler fuel and other indirect flame applications (300 Mcf or less on an average day) with alternate fuel capabilities.
   (2) Boiler fuel and other indirect flame applications (more than 300 Mcf on an average day and less than 3,000 Mcf on an average day) with alternate fuel capabilities.
   (3) Boiler fuel and other indirect flame applications (3,000 Mcf or more on an average day) with alternate fuel capabilities.
   H. Interruptible contract sales.

its contract price for gas. When storage costs and inventory of oil, as well as new higher priced natural gas, and the extra cost of capital investment is counted, Houston Lighting & Power figures that the Commission's order cost it almost $19,000,000 in 1974. It concedes that the extra fuel cost can be transferred to its customers but argues that this is a burden which the public should not be forced to bear.

## I.

■ Houston Lighting & Power contends that the Commission has no statutory authority to establish priorities for the supply of United Texas Transmission gas. This contention is answered by the recent opinion of this Court which discussed at length the authority of the Commission: *Railroad Commission v. City of Austin*, 524 S.W.2d 262 (Tex.1975). The Court there said that the Commission had authority to allocate the supply of a gas utility:

> The Commission *is* authorized to allocate Lo-Vaca's gas among cities, towns and corporations, and it is already doing so. It also has the jurisdiction and power to allocate TUFCO's gas, and the gas of all other gas utilities among cities, towns and corporations. 524 S.W.2d 262.

If a gas utility cannot meet the demands for gas, Article 6053 provides that the Commission may require the utility to augment its supply. If additional gas it not available, and the public interest requires it, the Commission may set priorities and may do this according to the end-use to be made of the gas. The Commission is not limited to ratable apportionment of available gas to all customers or potential customers of the gas utility. Homes and hospitals may be kept warm even when brickyards are cold.

## II.

■ Houston Lighting & Power next complains that it is being deprived of valua-

ble property rights when gas to which it is entitled under an express provision of its contract is denied to it by a different priority program imposed by the state. The short answer to this contention is that Houston Lighting & Power made its contract for gas supply at a time when Article 6053 and the other pertinent statutes were in force. If the priority of curtailment were a question to be resolved only according to the respective rights of the parties to the contract, the contract provisions would govern. The shortage of natural gas, however, has become a matter of serious proportions—and not just for two or more contracting parties but for the public welfare and the entire economy. Houston Lighting & Power and United Texas Transmission could not by their agreement set aside the statutes of the state or obstruct enforcement of them. The public interest is paramount and it may be, and must be, protected by the Commission. The statutes so provide.

■ Though the priorities of contract and Commission order differ, the contract provision is not inconsistent with the superior statutory authorization for the regulation of service rendered by gas utilities.[3] The contract should be considered to incorporate the regulatory authority of the Commission as provided by the statutes at the time of the execution of the contract. *East Texas Motor Freight Lines v. U. S.,* 239 F.2d 417 (5th Cir. 1956); *Hall v. Weller, Hall and Jeffery, Inc.,* 497 S.W.2d 374 (Tex. Civ.App.1973, writ ref'd n. r. e.); 17A C.J.S. Contracts § 330. A provision in the contract contrary to the superior regulatory authority would have been of no effect, because the statutes could not be nullified and because of the common law rule that a public service corporation cannot deprive itself of its duties to the public by means of contract. *Lone Star Gas Co. v. Municipal Gas Co.,* 117 Tex. 331, 3 S.W.2d 790 (1928);

**3.** The contract did contain this provision: "This agreement is especially made subject to all present or future valid applicable rules, regulations, or orders of any commission or regulatory body having jurisdiction."

*Gulf, C. & S. F. Ry. Co. v. Morris,* 67 Tex. 692, 4 S.W. 156 (1887).

### III.

■ The question then becomes whether the Commission's order is warranted by the public interest. The burden imposed on Houston Lighting & Power must be justified by the benefits to be gained by the public if the order is to stand. *State v. City of Austin,* 160 Tex. 348, 331 S.W.2d 737 (1960); *Lone Star Gas Co. v. Kelly,* 140 Tex. 15, 165 S.W.2d 446 (1942); *City of West University Place v. Ellis,* 134 Tex. 222, 134 S.W.2d 1038 (1940).

■ In earlier days the Commission had to contend with the overproduction of oil and gas, and with the consequences—both above and below ground—upon conservation of those resources. The Supreme Court recognized the complexity of the problem, when combined with considerations of correlative property rights, and held that Commission rules and orders were not to be disturbed by the courts unless those rules or orders were clearly illegal, unreasonable, or arbitrary. *Brown v. Humble Oil & Refining Co.,* 126 Tex. 296, 83 S.W.2d 935, *motion for rehearing,* 87 S.W.2d 1069, 1070 (1935); *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961 (1945). As a society accustomed to the unlimited availability of inexpensive oil and gas adjusts to scarcity and exhaustion of those resources, the Commission faces what appears to be a far more difficult task. This Court must again emphasize the authority and responsibility of the Commission as it makes the many decisions, great and small, required for adjustment and transition. The courts will not be quick to strike down those decisions or use our detached study—usually so less well informed—to pick at imperfections here and there. We will limit ourselves to what we conceive to be our proper role: to see that constitutional and statutory limits are not exceeded and to guard against unreasonable and arbitrary action.

Following the lead of the Federal Power Commission (*see* 18 C.F.R. 2.78), the Railroad Commission by the particular order under attack as well as by the statewide order of January 5, 1973, has assigned the lowest priority of use to large consumption of gas for boiler fuel in those instances where an alternate fuel can be used. The reasons given are these: the burning of large volumes of gas to heat boilers is an inefficient use of that scarce resource, because it wastes heating capacity of the gas; there are alternative and less precious fuels that can be used for this purpose (e. g., oil and coal); the electric generating industry can better bear the loss of gas and the higher price and cost of conversion to employ another fuel, and the total economy will suffer the least harm.

■ Tenneco Chemicals, Inc. and Neches Butane Products Company, intervenors in this cause, introduced extensive evidence to prove that the vast petrochemical industry along the Texas Gulf Coast is dependent upon natural gas for raw material ("feedstock gas") and for precise temperature control and flame characteristics ("process gas"). To that evidence, however, Houston Lighting & Power argues that the Commission's order simply chooses one industry to pay the bill for higher fuel costs rather than another industry. The relative ability of vital industries and public utilities to cope with the curtailment program is relevant to the ultimate question of the effect of the program upon the public welfare. That is not, however, the controlling consideration in the cause before us. Our supply of natural gas, an irreplaceable resource, is rapidly dwindling. Texans in their homes and stores are dependent today upon this resource for heat—as well as for other uses. Among the natural resources available for fuel, natural gas is peculiarly important. Thirty-six percent of all natural gas consumed in Texas is burned under the giant boilers of the electric generating industry. We cannot say that the Commission was unreasonable or arbitrary in curtailing this consumption of gas and requiring the elec-

tric companies to shift to the use of different fuels.

Forty years ago the Legislature prohibited the use of sweet gas for the manufacture of carbon black; the statute withstood attack. *Henderson Co. v. Thompson*, 300 U.S. 258, 57 S.Ct. 447, 81 L.Ed. 632 (1937). The trial court wrote:

> As a matter of marshaling the natural resources of the state, the Legislature has the power when one resource is fitted for two uses and another resource for only one, to classify those natural resources as to the use to be made of them. *Henderson Co. v. Thompson*, 14 F.Supp. 328, 334 (W.D.Tex.1936).

The Legislature may authorize the Railroad Commission to "handle the details relating to the preservation and conservation of the natural resources of the State." *Corzelius v. Harrell*, 143 Tex. 509, 186 S.W.2d 961, 964 (1945). The Legislature by the statutes mentioned above has conferred authority upon the Commission as to the supply of natural gas of the gas utilities. In the exercise of that statutory responsibility the Commission may classify the fossil fuels according to need and use and may order restrictions upon the gas utilities so as to ease the transition from our present dependency upon natural gas. While the Commission could direct all intrastate gas utilities to restrict their supply for certain end-uses, the Commission could also effect these changes gradually and begin with those gas utilities forced to curtail supply in 1973.

For more than thirty years the Federal Power Commission has generally regarded the consumption of gas as boiler fuel for the generation of electricity as an inferior use. Its denial of certificates of public convenience and necessity, to transport gas interstate for this purpose, has been upheld as effecting conservation of the natural resource. *F. P. C. v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961). F.P.C. curtailment plans have been upheld as within its power (*F. P. C. v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369, 1972) and its subordination of the use of large volumes of gas as boiler fuel has been upheld as reasonable. *State of Louisiana v. F. P. C.*, 503 F.2d 844 (5th Cir. 1974); *Arkansas Power & Light Co. v. F. P. C.*, 517 F.2d 1223 (D.C.Cir. 1975); see generally Comment, F.P.C. Natural Gas Allocation: Curtailment in Context, 50 Texas L.Rev. 1370 (1972).

## IV.

Houston Lighting & Power also objects to the emergency exemption provision in the Commission's order which is designed "to prevent the loss of electrical service to residential and other human needs customers because of the recognized shortage of alternate fuels."[4] The objection is that the conditions of the emergency exemption make it unworkable, because no emergency exemption is available for air conditioning and because no exemption is available if facilities for an alternate fuel *could* have been installed whether actually installed or not. Though the objection has its merits, we leave the matter as it is for two reasons. First, we would not strike the order or require it to be rewritten for this consideration alone. We think that the Commission can easily achieve the purpose of the emergency provision without allowing itself to be hindered by problems of construction of the terms of its own order. Second, the Commission is always free to rewrite or modify any curtailment order to meet the need and to adjust for changed circumstances.

We agree with the trial court upon the validity of the order. The judgment is affirmed.

---

**4.** The quote is from the Examiner's Report in Gas Utilities Docket No. 502 dated December 21, 1973, which report was adopted and made a part of the order which is under attack in the present cause.