291 P.2d 764

**SOUTHWEST ENGINEERING CO., a Nevada corporation authorized to do business in the State of Arizona, Appellant and Cross-Appellee,**

v.

Rogert ERNST, State Land Commissioner of the State of Arizona; The State Land Department of the State of Arizona; and the State of Arizona, Appellees and Cross-Appellants.

No. 5881.

Supreme Court of Arizona.

Dec. 20, 1955.

Peterson & Karman, Casa Grande, for appellant and cross-appellee.

Ross F. Jones, Atty. Gen., Robert W. Pickrell, Asst. Atty. Gen., Perry M. Ling, Special Counsel, Phoenix, for appellees and cross-appellants.

STRUCKMEYER, Justice.

This action was commenced by appellant, Southwest Engineering Co., a corporation, against the State of Arizona and the State Land Commissioner to determine appellant's rights to the use of the subterranean water underlying its lands. The Superior Court found and so held that of the two legislative acts controlling the use of ground water, the Groundwater Code [1] of 1948 was constitutional but that Sections 2, 3, 4 and 5 of the Act of 1953 [2] were invalid and unconstitutional. The South-west Engineering Co. appealed from the judgment declaring the Act of 1948 constitutional, and the State of Arizona and the State Land Commissioner cross-appealed from the judgment declaring that those stated portions of the Act of 1953 were unconstitutional.

■ The Act of 1953. This Act established an area within the state in which the drilling of irrigation wells except replacement wells was absolutely prohibited for a period of one year. The prohibition was extented one additional year by the legislature in 1954 [3] to March 31, 1955; at that time it expired by virtue of the termination date therein expressed. Since the relief initially sought was a declaration that the prohibition against the drilling of new irrigation wells was unconstitutional and since by lapse of time between the rendition of the judgment of the lower court and the opinion of this court there is not now pending for determination an actual controversy, the cross-appeal is dismissed. Harrison v. Hunt, 28 Ariz. 75, 235 P. 158; Gibson v. Board of Supervisors, 20 Ariz. 222, 179 P. 640.

The Act of 1948. The significant facts alleged in the complaint and admitted by the answer establish that appellant is the owner, or has an interest in certain lands lying within the boundaries of the Gila-Santa Cruz Subdivision of the Santa Cruz and the Gila and Salt River groundwater [4] basins or subdivisions thereof, basins designated by the State Land Commissioner as critical groundwater areas pursuant to the authority conferred by the Act; that appellant drilled an irrigation well on its land but was notified by the State Land Commissioner that an attempt to irrigate lands from such well would be a violation of the penal provisions of the Act; that

1. Chapter 5, Laws of 1948, Sixth Special Session.

2. Chapter 42, Laws of 1953, First Regular Session.

3. Chapter 86, Section 4, Laws of 1954, Second Regular Session.

4. Section 2 of the Act defines ground water as "water under the surface of the earth regardless of the geologic structure in which it is standing or moving; it does not include water flowing in underground streams with ascertainable beds and banks."

appellant intends to drill an additional irrigation well but has been denied a permit therefor and is now threatened with criminal prosecution unless the whole of the Act is decreed unconstitutional and void.

Before considering the problems raised by the appeal it should be stated that much of the land in the State of Arizona is desert, capable of sustaining human life only if there is available a supply of water for irrigation. Agricultural development in the desert and semi-arid portions of the state has taken three forms. First, and in the earliest days, by the diversion of water from running streams and rivers having their sources in mountain springs; second, by the impounding of excess waters from floods and rains by dams and in reservoirs and their subsequent release through canals and ditches in time of need; and third, as these sources became inadequate or nearly so, by the pumping of waters lying or moving beneath the surface of the earth. It is to be recognized that from the time of the earliest settlers there has been some use of ground waters through artesian wells, windmills and centrifugal pumps set at or near the water table, but that deep-well pumping of waters in substantial quantities is a comparatively recent development.

In 1945 the legislature of this state, recognizing that the withdrawal of ground water beyond the rate of natural replacement threatened the economic stability of one of the state's most profitable industries, adopted an act [5] providing for the cooperation of the State Land Commissioner with the United States Geological Survey "for the purpose of gathering such information as may aid the legislature in considering the subject of a Ground Water Code", and appropriating funds to carry out the purposes thereof. Presumptively the information so obtained was used by the legislature in drafting the Act of 1948. The Act itself is detailed and comprehensive and does not require minute analysis herein. Essentially it provides a method for determining the areas within the state which do not have sufficient ground water to provide a reasonably safe supply for irrigation at the current rates of withdrawal. These areas are designated as "critical groundwater areas". After a groundwater area is designated as critical, the construction of new irrigation wells therein is prohibited with certain exceptions, i. e., domestic and replacement wells. Those who are pumping from existing wells are allowed to continue to the full capacity of such wells. It should be emphasized that in critical areas the Act does not purport to regulate the use of ground water between owners of land in cultivation, nor does it regulate the use of ground water outside of critical areas with exception that waste as defined is universally prohibited. By prohibiting the drilling of new wells in critical areas, the Act limits

5. Chapter 12, Laws of 1945, First Special Session.

the use of water to present facilities thereby preventing additional withdrawals from underground supplies which are determined to be inadequate.

Ground water has been the subject of numerous decisions of this court, culminating in the decision on rehearing in Bristor v. Cheatham, 75 Ariz. 227, 255 P.2d 173, in which this court reaffirmed in a divided opinion its previously adopted rule that the *doctrine of prior appropriation* does not apply to water percolating generally beneath the soil without ascertainable beds and banks. The majority held that the decision in Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369, became a rule of property in that by large investments in the reclamation of desert lands, rights had been acquired which were entitled to protection under the law as declared, and that as between users of water the doctrine of reasonable use applied, that is to say, as between individual rights this court would apply the doctrine of reasonable use so far as found applicable to conditions in Arizona. Specifically the question was left open as to the right of the state against individuals to regulate the consumption of ground water in the interest of the general welfare.

The purpose of the Act is set forth in Section 3 thereof:

"* * * that large areas of rich agricultural lands in Arizona are dependent, in whole or in part, upon ground water basins underlying such lands for their water supply, and that in a number of such basins withdrawals of ground water, greatly in excess of the safe annual yield thereof, is converting the lands of rich farming communities into critical groundwater areas, to the serious injury of the general economy and welfare of the state and its citizens. It is therefore declared to be the public policy of the state, in the interest of the agricultural stability, general economy and welfare of the state and its citizens to conserve and protect the water resources of the state from destruction, and for that purpose to provide reasonable regulations for the designation and establishment of such critical groundwater areas as may now or hereafter exist within the state."

The legislative finding that the exhaustion of ground water by excessive withdrawals threatens to destroy one of the principal economic resources of the state to the consequential serious injury of all is not disputed.[6] Such a conclusion is

6. "* * * The central tragedy of existence is that there are not enough of the material goods of existence, as it were, to go around; that while individual wants are infinite, the material means of satisfying those wants are finite that while in common phrase, we all want the earth, there are many of us but there is only one earth. * * *" Roscoe Pound, Administrative Application of Legal Standards, 44 American Bar Association Reports, 445.

obviously justified because unrestrained use must inevitably result either in complete exhaustion of the state's ground water so that in the end the lands dependent thereon will revert to their desert state or in the lowering of water tables so that the increased cost of pumping will reduce these lands to a marginal or submarginal condition.

It is appellant's position that it is the owner of the water underlying its land in that this court held as early as Howard v. Perrin, 8 Ariz. 347, 76 P. 460, 462, and repeatedly since, that "waters percolating generally through the soil beneath the surface are the property of the owner of the soil." As such, appellant argues, its property is protected against confiscation by the Constitution of the State of Arizona, Article 2, Section 4, and the nearly identical language of that portion of the Fourteenth Amendment to the Constitution of the United States declaring that no person shall "be deprived of life, liberty, or property without due process of law." [7]

It can thus be seen that a conflict occurs between appellant and the state by reason of the interest of the public in the preservation from destruction of a resource essential to the sustenance of life.

Where the public interest is thus significantly involved, the preferment of that interest over the property interest of the individual even to the extent of its destruction is a distinguishing characteristic of the exercise of the police power. The principle which we recognize here as controlling rests upon historic precedent extending back into the common law, Respublica v. Sparhawk, 1 Dall. 357, 1 L.Ed. 174, Bowditch v. City of Boston, 101 U.S. 16, 25 L.Ed. 980, and has had continuous recognition almost to the present moment. United States v. Caltex (Philippines), Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157.

It has application not alone to the disasters of fire, flood, pestilence and war, but to other circumstances where public interests dictate an unavoidable choice between one class of property as against another.

In Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568, where red cedar rust, an infectious plant disease, was destructive of the fruit and foliage of the apple but without effect on the value of the cedar, and communicated from one to the other, a Virginia statute providing for the destruction of red cedars without compensation to the owners was held to be a consti-

---

7. By Section 15 of the Act any person aggrieved by any determination, order or decision of the administrator of the Act may have the decision reviewed by an appeal to the Superior Court of this state which shall be a trial de novo, and thereafter may appeal to this court in the event of an adverse judgment in the Superior Court. This affords those affected a reasonable opportunity to be heard and to present evidence, and does not offend against due process in so far as that phrase is applicable to procedural deficiencies. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834.

tutional exercise of the police powers. The court said:

"On the evidence we may accept the conclusion of the supreme court of appeals that the state was under the necessity of making a choice between the preservation of one class of property and that of the other wherever both existed in dangerous proximity. It would have been none the less a choice if, instead of enacting the present statute, the state, by doing nothing, had permitted serious injury to the apple orchards within its border to go on unchecked. When forced to such a choice the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another which, in the judgment of the legislature, is of greater value to the public. It will not do to say that the case is merely one of a conflict of two private interests and that the misfortune of apple growers may not be shifted to cedar owners by ordering the destruction of their property; for it is obvious that there may be, and that here there is, a preponderant public concern in the preservation of the one interest over the other. [Citing cases.] And where the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property. [Citing cases.]

"We need not weigh with nicety the question whether the infected cedars constitute a nuisance according to the common law; or whether they may be so declared by statute. See Hadacheck v. [Sebastian] Los Angeles, supra, [239 U.S. 394] 411, (36 Sup. 143) [60 L.Ed. 348, 356, Ann.Cas.1917B, 927]. For where, as here, the choice is unavoidable, we cannot say that its exercise, controlled by considerations of social policy which are not unreasonable, involves any denial of due process. * * *" 276 U.S. 279, 280, 48 S.Ct. 247.

We are of the opinion that there is a preponderant public concern in the preservation of the lands presently in cultivation as against lands potentially reclaimable, and that where as here the choice is unavoidable because a supply of water is not available for both, we cannot say that the exercise of such choice, controlled by considerations of social policy which are not unreasonable, involves a denial of due process.

We are thus brought to appellant's proposition that the Act denies to it the equal protection of the laws in that the choice is unreasonable. While the phrase "equal protection of the laws" has not been precisely defined and is not susceptible of exact delimitation, Louisville Gas & Electric Co. v. Coleman, 277 U.S. 32, 48 S.Ct.

423, 72 L.Ed. 770, and while it sets a goal not attainable by the invention and application of a precise formula, Kotch v. Board of River Port Pilot Com'rs, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093, there can be no question as to the right of the state to enact laws based on classification of the objects of legislation or of the persons whom it affects. Nor is such questioned. Admittedly also the classification to be valid must be reasonable. Schrey v. Allison Steel Mfg. Co., 75 Ariz. 282, 255 P.2d 604; State v. Double Seven Corp., 70 Ariz. 287, 219 P.2d 776, 19 A.L.R.2d 1007; Valley National Bank of Phoenix v. Glover, 62 Ariz. 538, 159 P.2d 292; Begay v. Sawtelle, 53 Ariz. 304, 88 P.2d 999; Laney v. State ex rel. Jones, 20 Ariz. 416, 181 P. 186. The difference need not be great, Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 429, 56 S.Ct. 513, 80 L.Ed. 772, if any state of facts reasonably can be conceived that would sustain it. New York Rapid Transit Corp. v. City of New York, 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024, rehearing denied 304 U.S. 588, 58 S.Ct. 939, 82 L.Ed. 1548; Valley National Bank of Phoenix v. Glover, supra.

■■ Appellant argues that the class of persons here dealt with by the legislature is the agricultural operators of the state; that since equal protection requires that all persons within a class be treated alike, the Act is obviously arbitrary in denying some within the class the use of water for irrigation purposes. However, the equal protection of the laws does not mean that all occupations that are called by the same name must be treated in the same way. Dominion Hotel, Inc., v. State of Arizona, 249 U.S. 265, 39 S.Ct. 273, 63 L.Ed. 597. The classification is not established on the basis of agricultural operators but on the distinctions and differences between present agricultural users and potential agricultural users of ground water in critical areas. Admittedly the classification is an unusual one and one which did not have existence prior to the adoption of this Act, but this is not sufficient grounds to invalidate the Act if the classification has a rational basis. That the classification does have a rational basis is readily apparent. The supply of ground water within the territorial boundaries of the state, or any particular groundwater basin therein, is not unlimited and even though in some instances the limits thereof may be difficult to apprehend, ultimately and inevitably at one time or another it will become necessary to restrict the use merely because the available users and uses exceed the available supply. We do not doubt that it is the proper sphere of the legislature, in the interest of the general welfare, to say when that time has arrived by establishing the mechanics for its determination and upon such determination prescribing the economical consumption which constitutes the most efficient use of water. In critical areas where the supply of water is determined to be inadequate there can be no economic gain to the state by reclaiming additional desert lands since for each acre reclaimed an acre will eventually lose the

water upon which it is dependent for productivity and must necessarily be withdrawn from cultivation. Capital invested in the clearing and leveling of lands and in buildings, wells and ditches on the acreage required to be withdrawn from cultivation will be destroyed to the same extent as the catastrophe of flood, fire and war; and although the economic impact may be somewhat alleviated by the fact that the loss may extend over a period of time, still it is inevitable that such loss will occur. A classification which tends to prevent such an economic loss to the community and the state cannot be said to be without rational basis and therefore we cannot say that this classification based on such consideration is either whimsical, capricious, arbitrary or unreasonable.

It is urged that the classification is arbitrary because it permits unrestricted and unregulated pumping by the owners of lands in areas which are not critical and denies the same right to the owners of lands in critical areas, thereby conceivably having the effect of treating individuals of the same status on opposite sides of the boundary line in an unequal manner. To this we think there are two answers. First, discrimination or inequality is not forbidden if based on a reasonable classification. Schrey v. Allison Steel Mfg. Co., supra. Second, necessity requires, where the health, safety or general welfare of the people of a particular locality or area is imperiled, that the law although universal in nature be limited in its operation by circumstances to the particular area where a different treatment is required. Since a particular area may have a particular problem necessitating legislative differentiation, in the end the boundaries of the area must inevitably be fixed at one place or another. Unless it should appear, as it does not here, that the fixing of the boundaries under the legislative mandate will necessarily be determined on an arbitrary or unreasonable basis, the Act must be held constitutional. Merely because the possibility exists that there may be an arbitrary and capricious use of power legitimately delegated under the statute is not sufficient reason to entertain a presumption that the power granted will be so exercised. People of State of New York ex rel. Lieberman v. Van De Carr, 199 U.S. 552, 26 S.Ct. 144, 50 L.Ed. 305; Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480, L.R.A.1917F, 514. If the agency or public officer does act arbitrarily, the courts without declaring the statute invalid will annul the decision of the officer. Federal Trade Commission v. Gratz, 253 U. S. 421, 40 S.Ct. 572, 64 L.Ed. 993.

Appellant complains that the Act is void for want of definiteness and certainty in that it authorizes the Land Commissioner to determine what shall and what shall not be the law. There are two possible approaches to this attack, both suggested in appellant's argument. First, as is often the case, the Act is challenged on the basis that it is impossible for the individual

to determine what shall or shall not be a violation of the law. As to this the controlling principle repeatedly approved is stated in Connally v. General Construction Co., 269 U.S. 385, at page 391, 46 S.Ct. 126, at page 127, 70 L.Ed. 322:

" * * * and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. * * * "

Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886, rehearing denied 341 U.S. 956, 71 S.Ct. 1011, 95 L.Ed. 1377; City of Tucson v. Stewart, 45 Ariz. 36, 40 P.2d 72, 96 A.L.R. 1492. With this principle [8] we are in accord but we have difficulty in discerning its application to the Act here under attack. No particular language has been specified to which exception is taken, rather appellant relies on the broad proposition that the entire Act is so indefinite that men of common intelligence must necessarily guess at its meaning and differ as to its application. With this in mind, we have examined the Act as a whole and particularly Sections 7, 9, 10, 11 and 12 for which the failure to adhere involves criminal responsibility, and are of the opinion that there is sufficient notice of what ought to be and what ought not be done to comply with the Act. While we conclude that the Act is not wholly void for the reason assigned, it is not our intention now to pass approval upon every phrase or sentence therein. We simply treat the objection as raised and postpone judgment on any severable portion of the Act until specific circumstances are presented which may directly affect a litigant's rights. Gherna v. State, 16 Ariz. 344, 146 P. 494, Ann.Cas.1916D, 94; cf. United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877; Rescue Army v. Municipal Court of City of Los Angeles, 331 U.S. 549, 67 S.Ct. 1409, 91 L. Ed. 1666.

Second, it is appellant's argument that the language of Sections 5(a) and 6(a) [9] prescribing the principal duties of the Land Commissioner is so vague, uncertain and incomplete that he is at liberty to or

8. "Fundamental fairness of course requires that the people be given notice of what to avoid. If the purpose of a statute is undisclosed, if the legislature's will has not been revealed, it offends reason that punishment should be meted out for conduct which at the time of its commission was not forbidden to the understanding of those who wished to observe the law. This requirement of fair notice that there is a boundary of prohibited conduct not to be overstepped is included in the conception of 'due proc-

ess of law.' The legal jargon for such failure to give forewarning is to say that the statute is void for 'indefiniteness.' " Justice Frankfurter in the dissenting opinion to Winters v. People of State of New York, 333 U.S. 507, 524, 68 S.Ct. 665, 674, 92 L.Ed. 840.

9. "Sec. 5. * * * (a) It shall be the duty of the commissioner, from time to time, as adequate factual data become available, to designate groundwater basins and subdivisions thereof, and as fu-

must necessarily supply his own interpretation of what the law ought to be in order to accomplish the purpose of the Act. We have held that the duty imposed on a public official by statute must be prescribed in terms sufficient and definite to serve as a guide to those who have the duty imposed upon them. Hernandez v. Frohmiller, 68 Ariz. 242, 204 P.2d 854. Plainly if the language imposing the duty does not have such definiteness, then it does not have sufficient literal significance to be capable of intelligent execution; and, moreover, it violates Article 4 of the Constitution of this state directing that the powers of the three branches of government be separate in that it would amount to a delegation of legislative power to the Land Commissioner. We recognize that a delegation of authority in indefinite and uncertain terms will, if it is to be enforced at all, require arbitrary action by the administrative officer and cannot be distinguished in effect from a delegation of arbitrary authority. Hence, in our approach to this problem we shall consider at the same time appellant's further contention that there is no sufficient standard to guide the Land Commissioner in the exercise of the authority delegated and is an unconstitutional delegation of legislative power. Indefiniteness of statutory language may also be tested as an invalid delegation of

power. Wotton v. Bush, 41 Cal.2d 460, 261 P.2d 256, 260.

Before examining the Act to determine how the claimed unconstitutionality arises, we observe that there are presented to this court two opposing principles mutually antagonistic which cannot be entirely reconciled. Ideally, in a society in which the primary aim is the maintenance of the political and economical independence of the individual, in order that government may not be oppressive and tyrannial, certainty must be found within the law whereby men of common intelligence may know where the power and the authority of the government ends and individual rights begin. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. To this fundamental thesis of constitutional government we unhesitatingly subscribe; but this does not mean that established limitations have not been recognized by reason of its antithesis—that imperative necessity demands laws which are practicable and workable. It is commonly said that it does not invariably follow that an entire and complete separation of power of the three branches of government is desirable or was ever intended. Ex parte Grossman, 267 U.S. 87, 45 S.Ct. 332, 69 L.Ed. 527, 38 A.L.R. 131; Parker v. Riley, 18 Cal.2d 83, 113 P.2d 873, 134 A.L.R. 1405; People ex

ture conditions may require and factual data justify, to alter the boundaries thereof."

"Sec. 6. * * * (a) The commissioner is hereby authorized and it shall be his duty, from time to time, as adequate

factual data become available justifying such action, to designate critical ground-water areas, and as future conditions may require and factual data justify, to alter the boundaries thereof."

rel. Rusch v. White, 334 Ill. 465, 166 N.E. 100, 64 A.L.R. 1006. For example, the functions of public utility boards and workmen's compensation commissions are a blending of the recognized spheres of all three departments of government. The right is generally conceded to delegate to an administrative agency the power to adopt rules and regulations necessary to carry a law into effect. State v. Marana Plantations, 75 Ariz. 111, 114, 252 P.2d 87. In some cases such as zoning and the licensing of professions, the discretion vested is so broad and the limitation so general that there is little essential difference between such generalities and no standard at all. See, 92 A.L.R. 410, 54 A.L.R. 1110, 12 A.L.R. 1447. We note also a distinct modern tendency to be more liberal in the granting of discretion in the administration of laws in fields where the complexities of economic and governmental conditions have increased, particularly where it is impractical to lay down a comprehensive rule. Ashland Transfer Co. v. State Tax Commission, 247 Ky. 144, 56 S.W.2d 691, 87 A.L.R. 534.

 In the present case there is no uncertainty as to the principal duties required of the Land Commissioner under Sections 5(a) and 6(a) of the Act. He must designate groundwater basins and critical groundwater areas. The element of uncertainty in this Act is not in what end result is to be achieved or what administrative steps are to be followed in achieving the result.[10] It arises out of the inability of members of the public in appellant's position to know in advance from the Act itself their ultimate rights in the use of their property until the Land Commissioner has acted and has determined the fact upon which the law becomes operative. However, we think it is settled that the separation of power of the three branches of government does not prohibit the legal consequences expressed in the law from taking effect upon the ascertainment of a fact, state of facts or contingency to be determined by an administrative agency. The principle has heretofore been recognized in Arizona. Hernandez v. Frohmiller, supra; State v. Anklam, 43 Ariz. 362, 31 P.2d 888. It is predicated upon obvious governmental necessity.

" * * * Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends, would be 'to stop the wheels of government' and bring about confusion, if not paralysis, in the conduct of the public business." Union Bridge Co. v. United States, 204 U.S. 364, 387, 27 S.Ct. 367, 374, 51 L.Ed. 523.

---

10. Subsections (b) and (c) of both Sections 5 and 6 provide a detailed procedure for the establishment of groundwater basins and critical groundwater areas.

And is so generally recognized as to have universal application.[11]

■ We realize that under the circumstances it is difficult, if not impossible, for appellant to anticipate what the ultimate determination may be because the Act does not, except in a most general way through defining what are groundwater basins and critical groundwater areas, provide what evidence is relevant to the determination and what probative force need be given to any particular evidence. If the contingency upon which the law takes effect is ascertainable from a single fact, conceivably reasonable men could agree as to whether such fact did or did not exist or if a future event whether it would or would not be apt to occur and therefore the law would be sufficiently definite and certain that men would be reasonably able to anticipate administrative action and know their ultimate rights; but many determinations which must be made are not thus so simple. They rest upon the evaluation of many facts or even the want or lack of certain facts. This evaluation is necessarily a conclusion to which it is possible that reasonable men may differ. Nevertheless here again we cannot say that such uncertainty is sufficient to deprive the Act of constitutionality.

Often the action of administrative and executive officers is dependent upon the exercise of what is normally considered a judicial function requiring discretion, deliberation, thought and judgment. Batty v. Arizona State Dental Board, 57 Ariz. 239, 112 P.2d 870; Alabam's Freight Co. v. Hunt, 29 Ariz. 419, 426, 242 P. 658. Indeed, it has been bluntly said:

"As to the objection that the duties of the auditor, with respect to his inquiries under the fourth section, are judicial rather than executive, it is sufficient to say that every executive officer, when called on to act in his official capacity, must enquire and determine whether, on the facts, the law requires him to do one thing or another. * * *" Hoff v. Jasper County, 110 U.S. 53, 56, 3 S.Ct. 476, 478, 28 L.Ed. 68.

"Nor is there an invalid delegation of judicial power. To hold that there was would be to turn back the clock on at least a half century of administrative law. * * * In lieu of making that decision itself, [Congress] it could bring to its aid the services of an administrative agency. And it could delegate to that agency the determination of the question of fact whether a par-

11. "It is well settled that the legislature may make the operation or application of a statute contingent or dependent upon the existence or occurrence of certain facts or conditions, and may delegate to some other agency, such as an executive or administrative board or office, the pow- er to determine the existence or absence of such facts or conditions, and to carry out the terms of the statute according to the facts or conditions which it finds. This is not a delegation of the legislative function." 79 L.Ed. 481. Annotation and cases cited.

ticular coal producer fell within the Act. * * *" Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 400, 60 S.Ct. 907, 915, 84 L.Ed. 1263.

Many illustrations can be given where the determination of the ultimate fact was predicated on the determination of the existence or non-existence of other facts and by the application of the logical processes the ultimate fact as a conclusion was deduced, but we think it is only necessary to point out a few to indicate the scope of the principle here involved. In State of Wisconsin v. State of Illinois, 278 U.S. 367, 49 S.Ct. 163, 73 L.Ed. 426, Congress lodged in the Secretary of War the determination of what constituted an unreasonable obstruction to navigation in the Great Lakes. In upholding a determination of the amount of water that could be withdrawn through the Chicago Canal without creating an unreasonable obstruction to navigation, Mr. Chief Justice Taft, speaking for a unanimous court, said:

"But it is said the construction thus favored would constitute it a delegation by Congress of the legislative power and invalid. We do not think so. The determination of the amount that could be safely taken from the lake is one that is shown by the evidence to be a peculiarly expert question. It is such a question as this that is naturally within the executive function that can be deputed by Congress. [Citing cases.]" 278 U.S. 414, 49 S.Ct. 170.

In Opp Cotton Mills, Inc. v. Administrator of Wage and Hour Division, 312 U.S. 126, 657, 61 S.Ct. 524, 534, 85 L.Ed. 624, where the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. provided that minimum wages shall be fixed with "due regard to 'economic and competitive conditions'" and shall be such as "will not substantially curtail employment in the industry" the Supreme Court stated:

"True, the appraisal of facts in the light of the declared policy and in conformity to prescribed legislative standards, and the inferences to be drawn by the administrative agency from the facts, so appraised, involve the exercise of judgment within the prescribed limits but where, as in the present case, the standards set up for the guidance of the administrative agency, the procedure which it is directed to follow and the record of its action which is required by the statute to be kept or which is in fact preserved, are such that Congress, the courts and the public can ascertain whether the agency has conformed to the standards which Congress has prescribed, there is no failure of performance of the legislative function. * * * The essentials of the legislative function are the determination of the legislative policy and its formulation as a rule of conduct. Those essentials are preserved when Congress specifies the basic conclusions of fact upon ascertainment of which, from relevant data by a desig-

nated administrative agency, it ordains that its statutory command is to be effective." 312 U.S. 144, 145, 61 S.Ct. at page 532.

█ In the present case the prescribed legislative standards or guides are set forth in the definitions under Section 2 of the Act[12] and under Sections 5(a) and 6(a), supra, prescribing the duty to designate on factual data. Clearly the Land Commissioner does not have a roving commission to determine groundwater basins and critical groundwater areas in any manner he may choose. He must proceed in the manner and upon the evidence prescribed by these sections, and the factual data must tend to establish a groundwater basin or critical groundwater area within the meaning of the terms set forth in the definitions. While these definitions may be open to some criticism in that dispute may arise over their precise meaning or the limitations which circumscribe the Land Commissioner's action, yet this does not mean that their proper interpretation cannot be supplied by the application of ordinary principles of judicial construction.

"While a statute must be definite to be valid, and reasonable precision is required, yet merely because it is difficult to interpret does not condemn it as offending the constitution. * * *" Hernandez v. Frohmiller, supra, 68 Ariz. 251, 204 P.2d 860.

Appellant relies to great extent on Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446; Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, and our recent case of State v. Marana Plantations, supra. The two former cases are readily distinguishable on the basis of the observations of the court. In Panama Refining Co. v. Ryan it was stated:

"* * * As to the transportation of oil production in excess of state permission, the Congress has declared no policy, has established no standard, has laid down no rule. There is no requirement, no definition of circumstances and conditions in which the transportation is to be allowed or prohibited." 293 U.S. 430, 55 S.Ct. 252.

As pointed out, the legislature has not only declared its policy, but it has defined the circumstances and conditions under which drilling and pumping is prohibited. In Schechter Poultry Corp. v. United States

12. " 'groundwater basin' means land overlying, as nearly as may be determined by known facts, a distinct body of ground water, but the exterior limits of a groundwater basin shall not be deemed to extend upstream or downstream beyond a defile, gorge or canyon of a surface stream or wash."

" 'critical groundwater area' means any groundwater basin as herein defined, or any designated subdivision thereof, not having sufficient ground water to provide a reasonably safe supply for irrigation of the cultivated lands in the basin at the then current rates of withdrawal."

the court stated [295 U.S. 495, 55 S.Ct. 848]:

"To summarize and conclude upon this point: Section 3 of the Recovery Act (15 U.S.C.A. § 703) is without precedent. It supplies no standards for any trade, industry, or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For that legislative undertaking, section 3 sets up no standards, aside from the statement of the general aims of rehabilitation, correction, and expansion described in section 1. In view of the scope of that broad declaration, and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered."

In the present case the Land Commissioner has no discretion except in the limited sense of the evaluation to which we have referred.

In State v. Marana Plantations, the statute in question was so broad and general that if held to be valid it would constitute a grant of authority without limitation.

We held that the end result could not be distinguished from Schechter v. United States.

We conclude that if the legislature is denied the power to delegate determinations which are naturally the subject of experts, the many administrative agencies created by the state would be denuded of their utility and government in its most important aspects would become impossible. We do not think it necessary for the legislature to lay down in advance an exact mathematical formula to which the designated administrative agency must adhere for often, as here, circumstances may vary and the precision which would otherwise be desirable would serve to defeat the purposes of the legislative enactment. If the law provides a defined course of conduct upon the occurrence or determination of an occurrence of a particular condition or state of facts, even though that determination is dependent upon an evaluation in the nature of a deduction from facts, there is neither an unconstitutional delegation of power nor is the Act so indefinite and uncertain that it can be held to be invalid.

The judgment of the court below is affirmed.

LA PRADE, C. J., and UDALL and WINDES, JJ., concur.

PHELPS, Justice (dissenting).

I regret that I am unable to agree with the conclusion reached by the majority in

420

this case. I find no fault with the abstract principle of law enunciated in the majority opinion but I do find fault with its application to the facts.

Since the enactment of the law under consideration, this court by a majority opinion in the case of Bristor v. Cheatham, 75 Ariz. 227, 255 P.2d 173, has declared that ground water which is the subject of the act belongs to the owner of the soil.

The question presented is whether the legislature in enacting the law here under consideration known as the 1948 Water Code, in the exercise of its police power, violated the provisions of article 2, section 13 of the Arizona Constitution, and section 1 of the 14th Amendment to the Federal Constitution prohibiting the enactment of any law denying to any person within the jurisdiction of the state "equal protection of the laws."

I recognize that the police power of the state is broad when exercised in the interest of the safety, health, morals or general welfare of the state and it has been said that it is one of the least limitable of governmental powers and its operation often cuts down property rights. Queenside Hills Realty Co. v. Saxl, 328 U.S. 80, 85, 66 S.Ct. 850, 90 L.Ed. 1096; Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348; Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568, and many others. However, all of those cases are easily distinguishable from the instant case.

The police power may not be exercised arbitrarily or with unjust discrimination. We quoted with approval the following from 16 C.J.S., Constitutional Law, § 505, in the case of Valley National Bank of Phoenix v. Glover, 62 Ariz. 538, 159 P.2d 292, 300, to the effect that:

"* * * The equality clauses ·(of state and federal constitutions) do not prevent a state from resorting to classification for legislative purposes and confining such legislation to a certain class 'prescribing different sets of rules for different classes, or discriminating in favor of, or against, a certain class, provided the classification or discrimination is reasonable, rather than arbitrary, and rests on a real and substantial difference or distinction *which bears a just and reasonable relation to the legislation or the subject or object thereof,* and provided also that the legislation operates equally, uniformly, and impartially on all persons or property within the same class.'" (Emphasis supplied.)

An examination of many authorities on this subject indicates that this is a fair statement of the universal rule.

It is stated in Truax v. Corrigan, 257 U. S. 312, 42 S.Ct. 124, 131, 66 L.Ed. 254, 27 A.L.R. 375, that:

"* * * 'Classification * * * must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the

classification is proposed, and can never be made arbitrarily and without any such basis. * * *.' It must therefore obtain in and determine legislation; but it must regard real resemblances and real differences between things and persons, and class them in accordance with their pertinence to the purpose in hand."

The court further held that:

"If, as is asserted, the granting of equitable remedies falls within the police power, and is a matter which the Legislature may vary as its judgment and discretion shall dictate, this does not meet the objection under the equality clause which forbids the granting of equitable relief to one man and the denying of it to another under like circumstances and in the same territorial jurisdiction."

In Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679, in which an act of the Illinois legislature was under consideration wherein it was provided that the combination of capital, skill or acts of two or more persons or corporations, etc., to carry on a restriction in trade; to prevent competition in manufacturing certain products, fixing prices, etc., constituted a criminal offense but provided that the act should not apply to agricultural products or to livestock while in the hands of the producer or raiser. The court held the act unconstitutional upon the ground that agriculture and stockraising are in the same

class as any of the others named in the act in that they were all engaged in domestic trade. In the instant case all the parties involved in this litigation are engaged in agricultural pursuits and so far as the record discloses, all are equally capable of contributing to the economy and general welfare of the state if permitted to exercise their rights over their private property to the same extent as other farmers in the area.

Bearing this in mind let us examine the legislation under consideration. Section 3 of the act purports to establish a declaration of public policy concerning underground water and after stating that large areas of rich argricultural land in Arizona are dependent in whole or in part upon groundwater basins underlying such lands for their water supply and that in a number of such basins withdrawal of ground water greatly in excess of the safe annual yield thereof, is converting the lands of rich farming communities into critical groundwater areas resulting in serious injury to the general economy and welfare of the state and its citizens, declares the public policy of the state to be as follows, Section 75–147, 1952 Cum.Supp., A.C.A.1939:

"* * * It is therefore declared to be the public policy of the state, in the interest of the agricultural stability, general economy and welfare of the state and its citizens *to conserve and protect the water resources of the state from destruction,* and for that purpose

to provide reasonable regulations for the designation and establishment of such critical groundwater areas as may now or hereafter exist within the state." (Emphasis supplied.)

It will be observed that the only provisions made for the conservation and protection of the water resources of the state from destruction is to *provide reasonable regulations for the designation and establishment of such critical groundwater areas as may now or hereafter exist within the state but does not provide any authority for a reduction of the use of water in such critical groundwater areas when established.* Let me pose the very pertinent question: Does the above provision even tend to achieve the object of the act when it expressly maintains the status quo of the greatly excessive withdrawal of water from the critical groundwater area over the estimated recharge thereof, thus carefully preserving the existing conditions which are recognized in the act as the sole cause of creating the established "critical groundwater area?" If logic now prompts no response the future will.

Section 6 of the act, Section 75–150(a), 1952 Cum.Supp., A.C.A.1939, provides that:

" (a)—The (state land) commissioner is hereby authorized and it shall be his duty, from time to time, as adequate factual data become available justifying such action, to designate critical groundwater areas, and as future conditions may require and factual data

justify, to alter the boundaries thereof."

Section 7, section 75–151, 1952 Cum.Supp., A.C.A.1939, insofar as here material, provides that:

"No person except as hereinafter provided shall construct any irrigation well in any critical groundwater area established as herein provided without a permit therefor. * * * No permit shall be required for the completion of any well located within a critical groundwater area and substantially commenced prior to the designation of such critical groundwater area, or for the construction of any well in any such area an uncancellable and binding contract in writing for the construction of which shall have been made and entered into prior to the effective date of this act (§§ 75–145—75–160) ; provided, however, that the well or other works for the withdrawal of groundwater thus substantially commenced or under contract for construction shall be completed within one year from the date of designation or alteration of such critical groundwater area."

Section 8, section 75–152, 1952 Cum.Supp., A.C.A.1939, provides:

"Issuance of permit.—Upon application made as provided in section 7 (§ 75–151), the commissioner shall issue a permit for the construction of the proposed well, except that no permit shall be issued for the construction of an ir-

rigation well within any critical groundwater area for the irrigation of lands which shall not at the effective date of this act be irrigated, or shall not have been cultivated within five years prior thereto."

Section 16 of the act, section 75–160, 1952 Cum.Supp., A.C.A.1939, provides:

"Nothing in this act (§§ 75–145—75–160) shall be construed to affect * * * the right of any person to continue the use of water from existing irrigation wells or any replacements of such wells."

Section 5, section 75–149, 1952 Cum.Supp., A.C.A.1939, of the act provides for the designation or alteration of groundwater basins or subdivisions thereof within the state, giving to the commissioner and to his official representatives reasonable access to the lands included therein but expressly provides *that the authority given shall not be construed as giving the commissioner authority to regulate the drilling or operation of wells in such groundwater basin or subdivision.*

The records in the case disclose that pursuant to the provisions of the 1948 Water Code, a hearing was held in the high school auditorium at Casa Grande for the purpose of determining whether the area within the Gila-Santa Cruz Subdivision of the Santa Cruz and the Gila and Salt River Groundwater Basin should be declared a critical water area, at which 130 interested parties were present and given an opportunity to present any data they wished. The State Land Commissioner then had in his possession a report made under the supervision of the U. S. Geological Survey after a technical investigation made by it in response to the request of and in cooperation with the said State Land Commissioner, pursuant to the provisions of section 4, Senate Bill No. 3, chapter 12, Laws of 1945. Thereafter on June 18, 1951, the State Land Commissioner declared the area within the Gila-Santa Cruz subdivision groundwater basin to be a critical water area and ordered that the drilling of all wells in such subdivision would be done only in compliance with the terms of the 1948 Water Code.

Based upon the technical investigation and report of the U. S. Geological Survey the commissioner found, among other things, the following facts:

"1. That the average drop in the water table in the Florence-Casa Grande area since 1940 has been about 34 feet, and that the annual pumpage is about 15 times the estimated recharge.

"2. That the average drop in the water table in the Maricopa-Stanfield area since 1940 has been about 35 feet, and that the annual pumpage is about 37 times the annual recharge."

The commissioner found further that the Florence-Casa Grande area and the Maricopa-Stanfield area are all one interconnected basin so that the draft from one part

of the basin will eventually affect all of the area.

The majority interprets the act to mean that the classification involved here is based upon the "difference between present agricultural users and potential agricultural users of ground water in critical areas." By "present" agricultural users I presume the majority meant the agricultural users at the effective date of the act.

We will assume that the classification stated in the majority opinion rests upon a correct basis. The test to be applied in determining whether the classification provided confers equal protection guaranteed in the state and federal constitutions, is:

1. What is the object the state seeks to accomplish by the challenged statute?

2. Does the statute place persons in two or more classes and apply differently to the different classifications?

3. Can it reasonably be argued that the object of the statute will be promoted by a recognition of the differences between the classes and the different application of the statute to the several classes?

The authority for the above test is found in Joseph S. Finch & Co. v. McKittrick, D.C., 23 F.Supp. 244. This case was affirmed by the Supreme Court of the United States in an opinion written by Mr. Justice Brandeis without comment on the above test. See 305 U.S. 395, 59 S.Ct. 256, 83 L. Ed. 246, cited frequently.

If question No. 3 can be answered affirmatively then the classification is not arbitrary and capricious and the equal protection clause is not violated. The welfare of the people of the state of Arizona is declared in the act to depend upon the conservation and protection of the underground water resources from destruction, to the end that the lands now in cultivation will not return to the desert. If the act under consideration does not bring about this result then the answer to question No. 3 must be in the negative and the equal protection clauses of the state and federal constitutions are violated.

The avowed object of the act and policy of the state under the provisions of the act is to conserve and protect the groundwater resources of the state from destruction. Does it do that? Let us look again at the provisions of the act. *It provides that no person whose land shall not be irrigated at the effective date of the act or shall not have been cultivated within five years prior thereto shall be permitted to drill an irrigation well upon his land located in a critical groundwater area.* It expressly provides, however, that all persons who at the effective date of the act have existing irrigation wells may continue to use water therefrom or from any replacements thereof without any reduction whatever upon the use thereof.

Where the water is being withdrawn from a critical groundwater area as found by the U. S. Geological Survey at the rate of from 15 to 37 times greater than the es-

timated recharge, can it be said that the declared purpose of the act to conserve and protect the water resources of the state from destruction is being promoted by a recognition of the differences between the classes and the different application of the statute to the several classes? Can it be said the classification set up in the act has any reasonable relation to the avowed purpose and object of the act? The answer is unequivocally No. The mere designation of such an area as a critical groundwater area and at the same time permitting the continued withdrawal of water therefrom at a rate of from 15 to 37 times greater than the recharge thereof does not promote the object and purpose of the act at all. Common sense dictates that in any area where the withdrawal of water is in excess of the recharge that disaster is eventually inevitable and where as in the finding of the State Land Commissioner, the withdrawal is 15 times greater in the Florence-Casa Grande critical groundwater area than the estimated recharge, and in the Maricopa-Stanfield area 37 times greater than the estimated recharge, disaster is imminent and the statute under consideration will not and cannot prevent the return of the area involved, to the desert in the very near future.

There is the further incurable defect in the language of the statute in that there is no distinct line of differentiation between the two classes. The exceptions of persons from the operation of the act who had substantially commenced to drill an irrigation well at the date the area was designated as a critical groundwater area and persons who had a binding written contract to drill a well at the time the act became effective, amounts to a flagrant discrimination as between persons within the same class. This is not permitted under the law. The law makes it a criminal offense for appellant and others in the same class to drill wells and withdraw water from beneath the soil while the person excepted from the operation of the law may do so with impunity provided they complete the drilling of the well within one year from the designation of the "critical groundwater area" within which their land is located.

If the majority opinion states the correct basis of classification then the persons included in the exceptions fall in the same class as appellant and others similarly situated for they were not irrigating their land at the effective date of the act and had not been within five years prior thereto and the fact that they had substantially commenced to drill an irrigation well or had a binding written agreement to have one drilled, forms no reasonable basis for the exceptions made and extending the time for one year within which to complete the well. Under the classification upon which the majority opinion rests they must have been irrigating their land with underground water at the effective date of the act or have done so within five years prior to that date.

426

There is nothing in the record to indicate how many farmers were included in the exception. And it is immaterial whether they were few or many for the reason that by the very terms of the act they were excepted from its operation which renders the act violative of the equal protection clauses of the state and federal constitutions and therefore cannot stand as a valid law. It is the universal rule that *all* persons within the same class are guaranteed the equal protection of the law under both the state and federal constitutions. Any legislation which violates these constitutional provisions is void. This case is analogous to and falls within the rule laid down in Connolly v. Union Sewer Pipe Co., supra.

I find no case in the books where, under the police power the state has said to a property owner that he cannot use his property for any purpose whatsoever. It is only in the emergencies of war, pestilence, disease, fire, etc., where it is necessary to destroy such property for the safety, morals, health or general welfare of the community, the state or nation, that destruction of property without adequate compensation is sanctioned, as in Miller v. Schoene, supra; Hadacheck v. Sebastian, supra; United States v. Caltex (Philippines), Inc., 344 U. S. 149, 73 S.Ct. 200, 97 L.Ed. 157.

In many cases restrictions upon the use of private property have been upheld by the courts, such as zoning ordinances limiting the kind of buildings which may be constructed in certain areas, their use,

distance from the sidewalks and sidelines, etc. In cases involving natural gas a legislative restriction upon the use of what is defined as sweet gas suitable primarily for heating and manufacturing purposes provided that it can only be used for the purposes therein designated, has been upheld. Henderson Co. v. Thompson, D.C., 14 F. Supp. 328. But the classification in those cases had a reasonable relation to the subject and object of the law, to wit, to prevent waste of natural resources whereas in the instant case there is no such relation in the classification set up to the object and purposes of the law. In states where oil has been found legislation has been enacted designed to prevent waste and to protect all property owners in the field upon the basis of an equitable distribution. In California it is required that oil wells shall be spaced a certain distance apart. Wotton v. Bush, 41 Cal.2d 460, 261 P.2d 256. Other states have similar methods of equitable distribution and conservation of such natural resources.

In the instant case appellants and others similarly situated are by the terms of this act not only denied the right to use and enjoy that which this court has solemnly declared to be their private property but has rendered worthless the land under which it is located. Its complete destruction by others is authorized for the exclusive benefit of those who are destroying it and upon whom no restraints are imposed in the act, but on the other hand are

expressly authorized to continue in their destructive course by permitting them to withdraw water from these critical ground-water areas at a rate 15 to 37 times greater in volume than the estimated recharge.

In summation, it is my sincere view that the attempted classification has no reasonable relation to the subject or object of the legislation, the avowed purpose of which is the conservation and protection of the underground water resources of the state from destruction and consequent return of present agricultural lands to the desert. Neither does it draw a distinct line of differentiation between the classes established but provides expressly for exceptions authorizing the transfer of a nonuser of water at the time the act became effective to participate in the use of water thereafter, if at the time the act is effective he has a binding contract to drill a well upon his property or if he has commenced the drilling of a well prior to the designation of the area as critical in which his land is located. In other words, these persons although not irrigating at the effective date of the act or within five years prior thereto, are excepted from its operation. This in itself under all of the authorities, renders the statute invalid. Certainly it cannot be reasonably argued that the object of the statute, to wit, the conservation of water in the restricted area will be promoted by the recognition of the differences between the classes set up in the act and the different application of the statute to such classes in light of the unquestioned, undisputed fact that the water is now being withdrawn and has at all times since the Geological Survey subsequent to 1945, been withdrawn at the rate of from 15 to 37 times greater than the recharge. The act expressly preserves the status quo of withdrawal over the rate of recharge.

It is therefore my view, and I am convinced beyond a reasonable doubt that the act is unconstitutional as in violation of the equal protection clauses of both the state and federal constitutions and that the judgment of the trial court should be reversed with directions to enter judgment for appellant.